UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISON

| | | |
|---|---|---|
| FYNALE BARNWELL, and | ) | |
| SHAVELL BARNWELL, | ) | |
| individually and as natural | ) | CASE NO.: 3:23:CV-00583-SAL |
| parents and guardian of M.B., | ) | |
| a minor child, | ) | |
|     Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| LEXINGTON SCHOOL | ) | **RESPONSE TO "DISTRICT** |
| DISTRICT ONE, and GERRITA | ) | **DEFENDANTS' MOTION TO DISMISS** |
| POSTELWAIT, in her individual | ) | **AMENDED COMPLAINT" &** |
| capacity, and NICOLE | ) | **DISTRICT DEFENDANTS'** |
| LIVINGSTON, in her individual | ) | **MEMORANDUM IN SUPPORT OF** |
| capacity, and JACOB SMITH, | ) | **THEIR MOTION TO DISMISS THE** |
| in his individual capacity, and | ) | **AMENDED COMPLAINT"** |
| SOUTH CAROLINA DEPT. | ) | |
| OF EDUCATION, | ) | |
|     Defendants. | ) | |
| ———————————— | ) | |

COME NOW, the Plaintiffs, Fynale Barnwell, ("Mr. Barnwell") and Shavell Barnwell (Ms. Barnwell), individually (collectively "Parents") and on behalf of the minor child M.B., ("Student") (collectively, "Plaintiffs") and in response to the Defendants, Lexington School District One (the "District") and Gerrita Postlewait ("Superintendent") and Nicole Livingston ("Ms. Livingston") and Jacob Smith ("Principal") collectively ("Defendants") "District Defendants' Motion to Dismiss Amended Complaint" [DE18], and "District Defendants' Memorandum in Support of Their Motion to Dismiss the Amended Complaint" [DE18-1] and in defense state as follows:

**INTRODUCTION & SUMMARY OF THE ARGUMENT**

"It needs no citation to suggest that the first amendment liberties have been considered as among the most important guaranteed to citizens in the Bill of Rights." *See Am. Civil Liberties*

*Union v. Ratford College*, 315 F. Supp. 893 (D. W.Va. 1970). What is more, courts have consistently emphasized that school aged students do not "shed their First Amendment rights at the schoolhouse gate". *See Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712 (D. Va. 2015). Instead, while public schools have more leeway in the suppression of speech, they may only do so when the subject speech will "materially and substantially disrupt the work and discipline of the school." *Id.* The instant case involves the suppression of Student's right to refrain from practicing the pledge of allegiance, as well as the deprivation of liberty she experienced when physically assaulted by a school employee in connection to the same choice.

The Defendants make a variety of arguments in support of their Motion. First, Defendants aver that Plaintiffs have not suffered a compensable loss with respect to the waiver of immunity contained in the South Carolina Tort Claims Act ("SCTCA"). More specifically, allege that the type of "emotional harm" alleged in the Amended Complaint does not qualify as mental anguish, which is specifically permitted as compensable harm under the SCTCA. However, the Amended Complaint on its face alleges "mental anguish" and sufficient facts and circumstances to support such a claim.

Second, Defendants claim that Plaintiffs § 1983 claims are barred by Eleventh Amendment Immunity because the District was acting as an "arm of the State" and, although named individually, the Principal, Superintendent, and Ms. Ms. Livingston were all acting in their "official capacity". Given that fact, Defendants argue that the Eleventh Immunity extends to all the individually named defendants. However, considering the test for finding that an entity is an "arm of the state" it is clear that the District is merely a local government, and is accordingly not permitted to avail itself of Eleventh Amendment Immunity. As to the individual defendants, South Carolina law plainly indicates that allegations against individuals employed by a

government entity in their "individual capacity" is sufficient to preclude application of Eleventh Amendment immunity.

Third, the Defendants allege that Counts III, IV, V, VI, and VII fail to state a cognizable claim under the First, Fourth, or Fourteenth Amendment. As to Count III, the Defendants claim that M.B. failed to plead a sufficiently serious injury or sufficiently "brutal" punishment. However, Defendants misconstrue the law in this regard. Under applicable precedent, Plaintiffs need not show a barbaric or brutal punishment, which led to debilitating or serious injury, where they plead that the punishment was *arbitrary*. This is precisely what Plaintiffs have pled in the instant case. As to Count IV, Defendants allege that school officials cannot be held to the dictates of the Fourth Amendment, unless they are implementing some policy. This too misconstrues the law. The Supreme Court has conclusively ruled that school officials who conduct "searches <u>or</u> seizures" must do so in accordance with the dictates of the Fourth Amendment.

As to Count V, Defendants allege that the Amended Complaint fails to adequately allege that M.B. was "punished while others, similarly situated were not". However, a review of the Amended Complaint belies that position. The Amended Complaint specifically alleges that M.B. was 'singled out' as the only African American student who failed to stop and acknowledge the pledge, although <u>other non-minority students</u> were permitted to continue to roam the halls. At this stage in the proceedings, these allegations must be taken as true, and evidence a discriminatory application of the rules based on race.

As to Count VI, Defendants again misconstrue, and read too broadly the Supreme Court decision in *Burnette*. The Defendants mince semantics to allege, essentially, that *Burnette* is not applicable to the instant scenario because M.B. was not "faced with expulsion" and/or there was no "policy" or legislation which <u>requires</u> students to state the pledge. While *Burnette* also

3

addressed the efficacy of litigation, enacted to force recitation of the pledge, the Supreme Court made clear that the First Amendment requires that students and citizens generally have freedom to refrain from reciting the pledge. The conduct of Livingston in physically assaulting M.B., in order to get her to stop and acknowledge the pledge flies in the face of such a constitutional right.

Finally, as to the last direct § 1983 claim, alleged in Count VII, Defendants allege that Plaintiffs' First Amendment retaliation claim is legally insufficient because it does not set forth "retaliation". By such an argument, Defendants overlook the fact that "retaliation" can be shown by conduct that is otherwise lawful, but in the particular context, has a "chilling effect" on speech. This is precisely what the Amended Complaint avers. More specifically, Plaintiffs claim that Livingston and Smith, by stopping M.B., escorting her to the principal's office to be reprimanded, and then lecturing her and questioning her motives for failure to comply with her patriotic duty had a chilling effect on M.B.'s speech. This is all that is required for a retaliation claim, under applicable law.

Defendants also claim that Plaintiffs have failed to adequately plead claims for supervisory liability in Count VIII, *Monell* liability in Counts IX and X, and ratification in Count X. In each of these arguments, Defendants focus on the lack of numerous incidents or a "pattern of conduct". However, under applicable law, as to each theory of relief above, the pleading of a "pattern" of conduct is a "typical" case, and not a hard and fast requirement. In reviewing the Amended Complaint allegations in Counts VIII, IX and X, and applicable law, Plaintiffs have set forth a plausible claim for relief.

Accordingly, each of the grounds for dismissal are without merit, and the court should deny the motion in its entirety.

4

## MEMORANDUM OF LAW

**I.    PLAINTIFFS WERE NOT REQUIRED, OR PERMITTED TO RESPOND TO THE MTD, WHICH WAS MADE MOOT BY FILING OF THE AMENDED COMPLAINT**

As an initial matter, the Defendants allege that Plaintiffs somehow erred in failing to respond to the original motion to dismiss, although they opted to file an amended complaint – mooting the motion to dismiss previously filed. This position flies in the face of well-established law and has no merit whatsoever.

"As a general rule, an amended pleading ordinarily supersedes the original and renders it of no legal effect." *See Young v. City of Mount Ranier*, 238 F. 3d 567, 573 (4th Cir. 2001). Accordingly, a defendant's "motion to dismiss is rendered moot upon the filing of Plaintiff's amended complaint." *See Reid v. United States*, 2023 U.S. Dist. LEXIS 24786 (D. S.C. Feb. 13, 2023). *See also Jones v. Good Hosp., LLC Sleep Inn*, 2020 U.S. Dist. LEXIS 120354 (D. S.C. Jun. 23, 2020) ("Although Defendants filed a Motion to Dismiss, Plaintiff thereafter filed an Amended Complaint. A timely filed amended complaint supersedes the original one and becomes the operative complaint in the case, it renders the original complaint 'of no effect.' Therefore, the Motion to Dismiss is moot [under those circumstances].").

Furthermore, Rule 12(a)(1)(B), Federal Rules of Civil Procedure, expressly permits the action taken by the Plaintiffs here – i.e., filing an amended complaint in lieu of responding to a potentially meritorious motion to dismiss. More specifically, Rule 12, Federal Rules of Civil Procedure provides that a party may "amend [their] pleading once as a matter of course within . . . 21 days after service of a motion under Rule 12(b)." *See* Fed. R. Civ. P. 12(a)(1)(B) (2022). This is precisely what Plaintiffs opted to do. When the Amended Complaint was timely filed, it rendered the original Complaint moot, and no response was required, or even permitted under

governing law, and the applicable rules of civil procedure. The Defendants' position that this court may grant the originally filed motion to dismiss, with respect to the now plainly mooted complaint has no basis in the law.

## II.     NEGLIGENCE CLAIMS ADEQUATELY ALLEGE THE ELEMENT OF "DAMAGE"

Next, Defendants allege that Counts I and II should be dismissed because they failed to state a claim. More specifically, the District asserts that the damages alleged by the Plaintiffs are insufficient to support South Carolina Tort Claims Act ("SCTCA") liability.

It is without question that the SCTCA defines "loss" as "bodily injury, disease, death, or damage to tangible property, including lost wages and economic loss to the person who suffered the injury, disease, or death, pain and suffering, mental anguish, and any other element of actual damages recoverable in actions for negligence, but does not include intentional infliction of emotional harm." *See* S.C. Code Ann. § 15-78-60 (2022). However, such loss includes, per the plaint text of the SCTCA "mental anguish." While the District cites dictionary definitions and other interpretation tools, this Court must apply the plain and unambiguous language of the statute. *See In re Gamble*, 2011 Bankr. LEXIS 2757 (M.D. N.C. Jan. 14, 2011) ("When interpreting a statute, a court must ascertain whether the statutory text is plain and unambiguous. If the text is indeed plain and unambiguous, then the court must apply the statute according to its terms.").

Courts of this District have recognized that "[m]ental anguish is compensable[] if it causes a substantial disruption in daily routine or a high degree of mental pain and distress." *See Woodberry v. United States*, 2015 U.S. Dist. LEXIS 92468 (D. S.C. Jul. 16, 2015). This is precisely what the Amended Complaint alleges. In fact, in the Amended Complaint in each count, Plaintiffs allege that they have and will continue to endure "mental anguish". In factual

support of this anguish, Plaintiffs allege that M.B. was a then 15-year-old, African American honor roll student and a "stand out member of several extra-circular activities" at her high school. [DE15 ¶ 5]. On the day in question, she was singled out, in a school hallway that was occupied by other non-African American students attending her school. [DE15 ¶ 35]. M.B. was singled out from these students, and physically accosted. [DE15 ¶ 34]. She was then marched to the principal's office and was extremely upset about being "punished" for her justified behavior. [DE15 § 36].

When considering the context at issue, the age of the Plaintiff, the fact that the unauthorized and completely unwarranted singling out of M.B. occurred in front of her peers, and in light of the fact that M.B was, by all accounts an excellent student who valued her reputation in the school, and valued her academic standing in the relevant community these facts adequately allege the type of "mental anguish" contemplated by the SCTCA.[1] Accordingly, the Motion to Dismiss on these grounds, must be denied.

## III.     § 1983 CLAIMS ARE NOT BARRED BY ELEVENTH AMENDMENT IMMUNITY (AS TO THE DISTRICT CLAIMS)

Next, the District alleges that all claims arising under 42 U.S.C. § 1983 must be dismissed because they are barred by Eleventh Amendment Immunity. More specifically, they claim that they should be considered as an "arm of the state" for purposes of applying said immunity.

The Eleventh Amendment limits the jurisdiction of federal courts to hear cases against states and state officers acting in their official capacities." *See Child Evangelism Fellowship v. Anderson Sch. Dist. 5*, 438 F. Supp. 609 (D. S.C. 2006). However, the immunity afforded by the

---

[1] The District also makes cursory references to intentional infliction of emotional distress ("IIED") argues against an alleged intentional infliction of emotional district claim, the Amended Complaint plainly reveals that no such claim has been alleged by the Plaintiffs against the District.

Eleventh Amendment does "not extend to political subdivisions of a state such as counties or municipalities." *Id.* Instead, to be entitled to immunity, the entity must show that it is "an arm of the state." *Id.* As noted by the District, there is contradictory case law on this topic, in the District of South Carolina. *Id.*

These "diverse holdings, even within the District of South Carolina underscore the conclusion that Eleventh Amendment immunity is a case-specific inquiry that is dependent on the individual laws at issue." *See Anderson Sch. Dist. 5*, 438 F. Supp. at 612. "In determining whether or not the District is an arm of the State entitled to sovereign immunity, the court is required to consider the twin aims of the Eleventh Amendment: (1) to alleviate the states' fears that federal courts would force them to pay their Revolutionary War debts; and (2) to affirm the integrity retained by each state in the federal system." *Id.* "Accordingly, the first and most critical step is determining whether a judgment against the government entity would have to be paid from the State's treasury." *Id.* "If a judgment would be required to be paid from the State's treasury, the inquiry ends there, and the entity is immune from suit." *Id.* However, "a finding contrary weighs against immunity."

In the instant case, the District concedes that the "state's treasury will not be impacted by this lawsuit". [DE18-1, p. 14]. Accordingly, it would be exceedingly difficult for this Court to find that the District was entitled to immunity under the Eleventh Amendment. Stated differently, although the court should still proceed to the second prong of the inquiry, it must keep in mind "that the most important factor -the lack of vulnerability of the State's purse – counsels against a finding of immunity." *Id.*

In evaluating the second factor, the court must consider "three factors, in determining whether allowing the suit to proceed against the entity would infringe the relevant state's

sovereignty: (a) the extent of control that the state exerts over the District and degree of autonomy that the entity enjoys from the state; (b) whether the entity deals with local rather than statewide concerns; and (c) the manner in which state law treats the entity." *See Anderson Sch. Dist. 5*, 438 F. Supp. at 619. As to the first "control" factor, the court should consider: "(1) whether the state retains a veto over the entity's actions; (2) the origins of the entity's funding; and (3) who appoints the entity's directors." *Id.*

As to the "control" factor, the District attempts to feign "control" by the State by pointing to the fact that the State constitution provides for a constitutional right to "minimally adequate education." [DE18-1, p. 15]. However, the fact that the State guarantees an education to its residents, does not equate with any finding of "control" by the state over the District. What is more, the fact that a recent "trend" of legislation has or will empower the South Carolina Department of Education ("SCDE") to regulate or monitor certain schools which have "fiscal problems" or for the Governor to "remove" a trustee who commits gross acts in furtherance of his office does not equate with a general veto power, or sense of control over the actions, decisions, and daily operations of the District.

As to whether the entity has largely local or state-based concerns, the answer is plainly – local. The District does not make any effort to explain why it should be deemed to have "local" concerns, apart from citing to one of the District judges who has found, in a case-by-case analysis, that a district was entitled to Eleventh Amendment Immunity. Each local school district is concerned with its own demographic of students, teachers, and the needs of its individual community. Sure, all of the districts are tasked with "teaching" in order to fulfill the state directive to afford an education, but such a broad stroke cannot be made when determining the "interest" of the District here. As stated in *Anderson Sch. Dist. 5*, the District is presumably "an

independent body which may sue and be sued, purchase liability insurance, and retain private counsel . . . without permission of the South Carolina Attorney General. Similarly, the District board may purchase and hold real and personal property, build and repair buildings, and declare bankruptcy." 438 F. Supp. at 619-20.

Finally, as to the last factor, in South Carolina, the District "is treated more like a local entity than an arm of the State." *Anderson Sch. Dist. 5*, 438 F. Supp. at 620. More specifically, the South Carolina Code "addresses school districts in Title 6, which deals with local governments, and not in Title 30, which deals with departments of the State." *Id.* Clearly, even the legislature considers the District to be a "local" government, rather than a State department. In addition, the District is capable of suing the State, which "weighs in favor of a finding that the State treats the District not as an arm of the state, but as an autonomous entity." *Id.*

Given the foregoing and considering particularly that a judgment against the District will have no effect on the State budget or purse strings, the Court simply cannot find that the District is an "arm of the State" which is entitled to Eleventh Amendment immunity. The motion to dismiss on these grounds must be denied.

## IV.    § 1983 CLAIMS ARE NOT BARRED BY ELEVENT AMENDMENT IMMUNITY (AS TO THE INDIVIDUAL DEFENDANT CLAIMS).

The Defendants also aver that the individual defendants are entitled to Eleventh Amendment immunity, although they have been named in their individual, rather than official, capacities. To begin with, Plaintiffs adamantly maintain that the District is not an arm of the State and as such, its employees are not entitled to immunity. However, assuming arguendo that the District is entitled to Sovereign Immunity, the individually named Defendants are not.

The Fourth Circuit has made clear that using terms such as "under color of law" or "under the color of office" or "color of authority" does not transform an "individual" suit against

government employees into an "official capacity" suit. *See Delong .v IRS*, 1990 U.S. App. LEXIS 27665 (4th Cir. Jul. 10, 1990). This is because "[the] only distinction [] between personal-capacity and official-capacity suits is on whom the plaintiff is seeking to impose liability; in the both cases, the official is acting under color of law." *Id.* (citing *Kentucky v. Graham*, 473 U.S. 159 (1985)). Given such distinction, a statement by the Plaintiff in his or her Complaint that the suit is against named persons "individually" makes it a "personal capacity" suit. *Id.*

Furthermore, the touchstone case for the proposition that "simply naming an individual as a federal defendant will not preclude the defense of sovereign immunity" pointed out that "defendants sued in their individual capacities for violations of constitutional rights should not be dismissed on grounds of [sic] sovereign immunity." *Id.* at n. 2. (citing *Gilbert v. Dagrossa*, 756 F. 2d 1455, 1458 (9th Cir. 1985). As applied here, Plaintiffs have individually named the defendants. Accordingly, the suit is an "individual capacity" suit, and the individual defendants are not entitled to sovereign immunity. The motion to dismiss on these grounds must accordingly be denied.

## V.    AMENDED COMPLAINT STATES A VIABLE CLAIM UNDER § 1983 AS TO EACH ALLEGED CONSTITUTIONAL VIOLATION

Next, the Defendants argue that assuming all other arguments fail, none of the claims set forth by Plaintiffs under 42 U.S.C. § 1983 state viable causes of action, under applicable law.

To state a cause of action under § 1983, a plaintiff must allege three elements: (1) "the deprivation of a right secured by the Constitution"; (2) "by a person"; (3) "acting under color of state law". *See Shreve v. Fetter*, 2013 U.S. Dist. LEXIS 144744 (E.D. N.C. Jun. 17, 2013). In the instant case, the Defendants challenge the first element set forth above, asserting that none of the facts stated in counts III, IV, V, VI, VII, allege a cognizable constitutional violation.

11

In the Amended Complaint, Plaintiffs set forth § 1983 claims in Count III [Due Process/Livingston]; Count IV [Fourth Amendment/Livingston]; Count V [Equal Protection/Livingston & Smith]; Count VI [First Amendment, Free Speech/Livingston]; Count VII [First Amendment, Retaliation/Livingston & Smith].

### Count III – Violation of Due Process

As to the due process claims, Defendants assert that the conduct alleged in the Amended Complaint is not sufficiently "severe" to warrant a constitutional violation under the Supreme Court's decision in *Ingraham v. Wright*, 430 U.S. 651 (1977). In *Wright*, the Supreme Court recognized that "The Due Process Clause of the Fifth Amendment, later incorporated into the Fourteenth Amendment, was intended to give Americans at least the protection against governmental power that they had enjoyed against the power of the Crown." *See Wright*, 430 U.S. at 673.

In that respect, "[the] liberty preserved from deprivation without due process included the right generally to enjoy those privileges long recognized at common law as essentially to the orderly pursuit of happiness by free men." *Wright*, 430 U.S. at 673. "Among the historic liberties so protected was the right to be free from, and obtain judicial relief for, unjustified intrusions of personal security." *Id.* The court continued, noting that "while the contours of this historic liberty interest in the context of [the] federal system of government have not been defined precisely, they have always been thought to encompass freedom from bodily restraint and punishment." *Id.*

As such, it is "fundamental that the state cannot physically punish an individual, except in accordance with due process of law." *Wright*, 430 U.S. at 674. Given the foregoing recitation of rights, which are always encompassed in the Fourteenth Amendment, the court ruled that "where school authorities acting under color of state law, deliberately decide to punish a child for

misconduct by restraining the child and inflicting appreciable physical pain, . . . Fourteenth Amendment liberty interests are implicated." *Id.* The court then held that the Fourteenth Amendment did not require notice and a hearing, <u>prior to</u> administration of corporal punishment in schools. *Id.* at 682.

After the opinion in *Wright*, the Fourth Circuit issued its opinion in *Hall v. Tawney*, which held that although not every instance of corporal punishment violates the Due Process clause, the "arbitrary" or "capricious" "administration" of corporal punishment may well be. 621 F. 3d 607, 612-13. Since *Wright* and *Hall*, the Fourth District has continually and consistently held that educators are not permitted to utilize "arbitrary . . . corporal punishment" in the school setting. *See Meeker v. Edmundson*, 415 F. 3d 317. 324 (4th Cir. 2005). What is more, in *Meeker*, the Fourth Circuit noted that even "corporal punishment pursuant to established disciplinary codes may not be cognizable as substantive due process violations, claims alleging *arbitrary violence* are." *Id.*

As applied here, there is no issue of notice. Instead, the question is whether the actions by Livingston constitute "deliberate punishment" that resulted in "restraint" and "appreciable pain" or were "arbitrary". Plaintiffs submit that the Amended Complaint states facts and circumstances meeting this standard. More specifically, the Amended Complaint alleges that: (A) Livingston was acting in the course and scope of her employment as a teacher [DE15 ¶ 64]; (B) that at that time, she imposed herself in a manner to intimidate, and coerce M.B. [DE15 ¶ 64]; (C) that her force was disproportionate to the needs presented under the circumstances (i.e., grabbing M.B. and restraining her, simply because M.B. exercised her right to continue walking during the pledge) [DE15 ¶ 66]. These facts and circumstances are sufficient to show corporate punishment that was at the very least "arbitrary" under the circumstances.

**Count IV – Violation of Fourth Amendment**

With respect to Count IV, the Defendants allege that there cannot be a Fourth Amendment "seizure" unless law enforcement are involved. However, applicable law proves contrary to this assertion. As noted by the Defendants, the Supreme Court has conclusively determined that "searches and seizures conducted on school premises by school officials are governed by the limits of the Fourth Amendment." *See DesRoches by Desroches v. Caprio*, 156 F. 3d 571, 574 (4th Cir. 1998) (citing *New Jersey v. T.L.O*, 469 U.S. 325 (1985)). Both the Fourth District and the United States Supreme Court have recognized, then, that both searches and seizures must be in accordance with the Fourth Amendment, and failure to abide by the dictates of that constitutional provision, by school officials are capable of constitutional vindication. This is the sole grievance raised by the Defendants as to the Fourth Amendment § 1983 claims, and as indicated above it is without merit.

**Count V – Violation of Equal Protection**

With respect to the equal protection claims in Count V, the Amended Complaint states a viable claim for relief. "The equal protection clause guarantees that all persons similarly circumstanced shall be treated alike." *See Koon v. Dyson*, 2004 U.S. Dist. LEXIS 32509 (D. S.C. Jul. 23, 2004). "To set forth a cognizable equal protection claim, therefore, a plaintiff must show that (1) he [or she] is similarly situated with [others] who received more favorable treatment; and (2) his [or her] discriminatory treatment was based on some constitutionally protected interest such as race." *Id.* The Amended Complaint sets forth facts and circumstances, which, taken as true, state a claim under the above standard. More specifically, the Amended Complaint alleges that Plaintiff was walking in the hallway during the pledge along with other nonminority students. [DE15 ¶ 35] ("Notably, there were people of other races walking in the hallway when

[Livingston] singled out Plaintiff with her unconstitutional actions, however, M.B. was the only African American in her view and she subjected her to unequal treatment stemming from her discriminatory animus and bias.").

However, it is M.B. who was singled out based on her race and accosted for her conduct with respect to the pledge. The Amended Complaint also alleges that M.B. was singled out because of her "minority status as an African American woman". [DE15 ¶ 77]. Again, taking these allegations as true, which the court must at these stage in the proceedings, the Amended Complaint states a claim under the equal protection clause.

### Count VI – Violation of First Amendment

As to Count VI, the arguments made by the Defendants are merely semantics. In *W. Va. State Bd. Of Educ. v. Barnette*, the United States Supreme court recognized that: "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." 319 U.S. 624, 642 (1943). It follows that any official who seeks to "compel[] the flat salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.*

This is precisely what the Amended Complaint alleges. How else would the Defendants "force" M.B. to comply with the pledge of allegiance than by punishing her and dragging her to the principal's office when she refused to do so? [DE15 ¶ 5] ("Livingston . . . demanded that M.B. stop to acknowledge the pledge . . . physically assaulted M.B. and then escorted M.B. to [the principal's office] so that M.B. could be punished."). Contrary to the Defendants

interpretation of *Barnette*, the above quoted holding cannot be clearer.[2] Regardless of whether M.B. was compelled through an official policy or resolution, or by the implicit "policy" of her school, the school district, the school board, and its employees, the proposition remains the same – the government cannot require compliance with the pledge, without violating the First Amendment.

**Count VII – Violation of First Amendment (Retaliation)**

As to Count VII, Defendants assert that the elements of a First Amendment retaliation claim have not been sufficiently stated. To state a claim for retaliation under the First Amendment, the plaintiff must show: (1) he or she "engaged in protected First Amendment activity"; (2) the defendants took some action that adversely affected his [or her] First Amendment rights"; and (3) "there was a casual relationship between his [or her] protected activity and the defendants' conduct." *See Davison v. Rose*, 19 F. 4th Cir. 626 (4th Cir. 2021). The plaintiff can establish "retaliation" in the second element by showing that the response of the actor would "chill or adversely affect protected activity." *See The Baltimore Sun Con. V. Ehrlich*, 437 F. 3d 410, 416 (4th Cir. 2006).

This proposition rings true, "even if the act [by the government in response to the protected speech], when taken for a different reason, would have been proper." *See McClure v. Port*, 914 F. 3d 866 (4th Cir. 2019). "The determination of whether government conduct or speech has a chilling effect or an adverse impact is an objective one – [the court] determine[s] whether a similarly situated person of 'ordinary firmness' reasonably would be chilled by the government

---

[2] Plaintiffs admit that there were *also* Fourteenth Amendment issues at play in *Barnette* concerning legislation which would "require" the Pledge of Allegiance. However, the Court took pains to emphasize that not only Fourteenth Amendment implications were at issue in the case.

conduct in light of the circumstances presented in the particular case." *See Taylor v. Amason*, 2015 U.S. Dist. LEXIS 131369 (D. S.C. Aug. 3, 2015).

The Amended Complaint states factual allegations that meet each element. Plaintiffs allege that M.B. engaged in her constitutionally protected right to refuse to acknowledge or participate in the pledge of allegiance. [DE15 ¶ 95]. In response, Livingston singled out M.B. and accosted her, and sent her to the principal's office. [DE15 ¶ 96]. Once M.B. arrived at the principal's office, Smith questioned her "patriotism" and essentially reprimanded M.B. [DE15 ¶ 101]. Both Livingston's actions in accosting M.B. and sending her to the principal's office, and Smith's actions in questioning M.B.'s motives and authority had a "chilling effect" on speech. Regardless of whether these actions would have been wholly proper outside of the context of the First Amendment, the law is well-settled that they are not permitted response to the exercise of free speech. The Amended Complaint states a claim for retaliation.

## VI.    SUPERVISORY LIABILITY CLAIMS ARE NOT SUBJECT TO DISMISSAL

Count VIII alleges supervisory liability as to Defendants Postlewait & Smith. It is well settled that "supervisory officials may be held liable [under § 1983] in certain circumstances for the constitutional injuries inflicted by their subordinates." *See Shaw v. Stroud*, 13 F. 3d 791 798 (4th Cir. 1994). Such liability is "not premised upon *respondeat superior*, but upon a recognition that supervisory indifference or tact authorization of subordinates misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Id.*

To establish supervisory liability, the plaintiff must show (1) "that the supervisor had actual *or constructive* knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; and (2) "that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to

or tacit authorization of the offense practices" and (3) "that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw*, 13 . 3d at 799.

As applied here, the Amended Complaint alleges sufficient facts and circumstances from which each element can be established. First and foremost, as argued in Section V, *supra*, the Complaint states a violation of numerous constitutional rights arising under the Fourteenth, Fourth, and First Amendments to the United States Constitution. Accordingly, there is a "direct" violation, upon which supervisory liability may attach. With respect to Smith, the Amended Complaint alleges that Smith had <u>actual</u> knowledge of the actions of Livingston [DE15 ¶ 102; 109]. However, with actual knowledge, Smith did not correct the actions of Livingston, reprimand Livingston, or otherwise attempt to intervene with her conduct. [DE15 ¶ 110].

Defendants cite to *Wellington v. Daniels* to support the proposition that single or isolated incidents are not "normally [sufficient] to establish supervisory inaction" in the context of § 1983. 717 F. 2d 923 (4th Cir. 1983). However, *Wellington* and other decisional law cited for this proposition apply in cases where knowledge is to be <u>imputed</u>, or stated differently, when there is no actual knowledge of the subordinate's actions. *See e.g., Kinard v. City of Greenville*, 2012 U.S. Dist. LEXIS 54174 (D. S.C. Apr. 18, 2012) (noting that knowledge may only be "imputed to the supervisory personnel" when there is more than a single or isolated act).

In the instant case, Plaintiffs allege that Smith as well as Postlewait had actual knowledge. In addition, with respect to Defendant Smith, it is clear from the face of the Amended Complaint that Smith had actual knowledge. In that respect, M.B. was brought to the principal's office immediately after the conduct occurred and was made aware of the conduct by M.B. [DE15 ¶¶

100-101]. Although Smith had actual knowledge of the conduct engaged in by Livingston, he did nothing to prevent, deter, correct, or punish the behavior.

Instead, Smith engaged in his own retaliatory conduct against M.B, questioning her motives and shaming her decisions. The ratification of Livingston's conduct by Smith, and by Postlewait proximately caused injury to M.B. by chilling her speech, in violation of her First Amendment rights. These facts and circumstances state a claim for relief, and the motion to dismiss on these grounds must be denied.

## VII.    *MONELL* LIABILITY CLAIMS ARE NOT SUBJECT TO DISMISSAL

As to the *Monell* liability, alleged in Counts IX and X of the Amended Complaint, Plaintiffs allege that these counts likewise state a claim for relief.

In *Monell v. Dept. of Social Serv.*, the Supreme Court found that municipalities can be sued under § 1983 when "the action that is alleged to be unconstitutional implements a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers or its visited pursuant to governmental custom even though such custom has not received formal approval through the body's official decision-making channels." 436 U.S. 658, 690-91 (1978). An "official policy" can be "inferred from a municipality's omissions as well as from its acts." *See Wellington v. Daniels*, 717 F. 2d 932, 935 (4th Cir. 1983). In such instances, the "omissions are actionable only if they constitute tacit authorization of or deliberate indifference to constitutional injuries." *Id.* at 936.

In that respect, supervisory officials "charged with the responsibility of making rules may be subject to § 1983 liability where their unreasonable failure to make rules cause their employees' unconstitutional practices." *See Avery v. County of Burke*, 660 F. 2d 111, 114 (4th Cir. 1981). While "single incidents" are "normally" insufficient to establish a *Monell* liability claim, the

19

plaintiff need not show that "all persons [similarly situated] have been mistreated." *Avery*, 660 F. 2d at 114. Instead, "[it] is enough that an identifiable group of people, of whom [plaintiff] is a part, is subject to constitutional deprivations through the inaction of the [defendant]." *Id.* at 114.

With respect to failure to train based claims, the Plaintiff must establish that "the failure to train [] amount[s] to deliberate indifference to the rights of persons with whom the [municipality employees] come into contact [with]." *See Estate of Jones v. City of Martinsburg*, 961 F. 3d 661 (4th Cir. 2020). "If the [institutions] failure to train reflects such a deliberate or consciously indifferent policy, then its failure can fairly be said to be the moving force behind the constitutional violation." *Id.* As emphasized above, "the Supreme Court has left open the possibility that in light of the duties assigned to specific [employees] the need for more or different training may be so obvious, and the inadequacy so likely to result in the violation of the constitutional rights [of third persons], that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *Id.*

In the instant case, Plaintiffs have set forth sufficient facts to meet the above stated standard. Plaintiffs allege that the District has a duty and obligation to implement "policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by subordinates that violate the constitutional rights of students." [DE15 ¶ 120]. Plaintiffs further allege that the District "failed to implement" such policies in order to prevent the constitutional violation alleged in the Amended Complaint. [DE15 ¶ 122]. Furthermore, Plaintiffs allege that the current implied or express policy of the District "instruct[ing] students to rise and stand for the pledge of allegiance and immediately following the last words [thereof] to remain standing for a moment of silence [makes] them indistinguishable for students thereby having the force of law." [DE ¶ 123].

Essentially, the policies enacted force all students, who would otherwise exercise their right to refrain from the pledge, to stand and acknowledge.

Furthermore, the lack of policy with respect to students who choose not to rise and acknowledge implicitly authorizes school employees, such as Smith, and Livingston to violate M.B.'s rights under the First, Fourth and Fourteenth Amendment. Similarly, as to the *Monell* claim in Count IX, Plaintiffs allege that there was an "obvious" need to train teachers and principals regarding the rights of students in connection with the pledge of allegiance. [DE15 ¶¶ 115, 116]. Again, the District alleges that to be legally sufficient Plaintiffs must allege some "pattern" of conduct, or "a similar number of incidents over a similar timeframe". [DE18-1, 27]. However, as noted above, this is not a hard and fast requirement, but instead a "general" or "typical" allegation under *Monell*. This requirement does not apply where the failure to train is "obvious", or where Plaintiff can establish that similarly situated students are also deprived of their rights. Plaintiffs have stated sufficient facts to plead a plausible claim for relief under such a standard, and *Monell* and the motion to dismiss on these grounds must be dismissed, accordingly.

## VIII.   PLAINTIFF'S CLAIMS AGAINST LOCAL GOVERNING BODY ARE NOT SUBJECT TO DISMISSAL.

While the District cites *Starbuck v. Williamsburg James City Sch. Bd.,* as a "cogent example" of ratification liability" the District improperly implies that this type of claim is limited to ratification of an official's decision by the Board, or local governing body. 28 F. 4th 529 (4th Cir. 2022). However, this is not the holding of *Starbuck* and the factual scenario in *Starbuck* is delineated by the court as only "one" situation in which ratification liability may apply.[3]

---

[3] In discussing this point, the *Starbuck* court stated: "when a policymaker has the authority to review the decision of a subordinate, its approval of that alleged unconstitutional decision *can also* give rise to liability. Under *this theory of liability*, if the [Board] ratified the suspension of a

In addition to such a circumstance, the *Starbuck* court reiterated that: "local governing bodies can be sued directly under § 1983 where the action that is alleged to be unconstitutional implements or executes a decision officially adopted and promulgated by that body's officers." *Starbuck*, 28 F. 4th at 533. The same court likewise noted that, "[e]ven a single decision taken by the highest officials responsible for setting policy in that area of the government's business can render a municipality subject to suit." *Id.*

As applied here, the Amended Complaint alleges that the District had "final policy-making authority" with respect to the pledge of allegiance, and the handling of students who failed to recognize or acknowledge the same. [DE15 ¶ 133]. Plaintiffs likewise alleges that the Board knew of "and specifically made a deliberate choice to approve Defendants [] Livingston and [] Smith's actions, inactions, and the basis for it." [DE15 ¶ 134]. Regardless of whether a "vote" or "board action" was taken in connection to the incident at issue, neither Livingston nor Smith were disciplined, or sanctioned for their conduct in connection to M.B.'s exercise of her right to refrain from stating the pledge. [DE15 ¶ 129] (alleging that District failed to "disapprove conduct by subordinates" in connection to the acts alleged in the Amended Complaint).

Ultimately, at this stage in the proceedings, the court must accept the allegations as true, and taken as such, these allegations support the claim alleged in Count XI.

## **CONCLUSION**

WHEREFORE Plaintiffs Respectfully Request this Honorable Court: (1) <u>deny</u> the Motion, as to all grounds set forth therein;[4] (2) <u>order</u> that the District, Principal, Superintendent,

---

student by subordinates, the [Board] would be liable for any deprivation of constitutional rights caused by that suspension." *See Starbuck*, 28 F.4th at 534 (emphasis added).

[4] Alternatively, if the Court grants the Motion to Dismiss, Plaintiffs submit that dismissal should be without prejudice and leave to amend. *See e.g., Riley v. Civil Action No. 2014-CP-32-00665,*

and Ms. Livingston must file a responsive pleading within fifteen (15) days of the Court's Order;

and (3) <u>award</u> any and all other relief deemed just and necessary under the circumstances.

Respectfully submitted,

s/Tyler D. Bailey
Federal ID #12294
BAILEY LAW FIRM, L.L.C.
Attorney for Plaintiff
1921 Henderson Street (29201)
P.O. Box 532
Columbia, South Carolina 29202
Telephone: (803) 667-9716
Fax: 1-803-526-7642
Email: tyler@baileylawfirmsc.com

Columbia, South Carolina

---

2019 U.S. Dist. LEXIS 183384 (D. S.C. Oct. 23, 2019) (reiterating that a complaint should be dismissed without prejudice unless "a district court is truly unable to conceive <u>any set of facts</u> under which a plaintiff would be entitled to relief.").

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing response has been

electronically filed and served via EM/ECF on this  19th day of April 2023.

By: *Tyler D. Bailey*
Tyler D. Bailey, Esq.