IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Fynale Barnwell and Shavell Barnwell, Individually, and as natural parents and Guardians of M.B., a Minor Child,<br><br>                              Plaintiffs,<br><br>v.<br><br>Lexington School District One, Gerrita Postlewait, in her individual capacity, Nicole Livingston, in her individual capacity, Jacob Smith, in his individual Capacity, and South Carolina Department of Education<br><br>                              Defendants. | C/A No. 3:23-cv-00583-SAL<br><br><br><br><br><br>**ORDER** |

The matter is before the court on defendant South Carolina Department of Education's ("SCDOE") second motion to dismiss, ECF No. 17, and defendants Lexington School District One ("Lexington One" or the "District"), Gerrita Postlewait, Nicole Livingston, and Jacob Smith's (collectively, the "District Defendants") motion to dismiss amended complaint, ECF No. 18.

## BACKGROUND

Plaintiffs Fynale and Shavell Barnwell are the parents of M.B., who was a 15-year-old honor roll student at River Bluff High School at the time of the events described in the Barnwells' amended complaint. [ECF No. 15 ¶ 5.] The Barnwells allege that M.B. was walking in the hallway to her class at approximately 8:40 a.m. on November 29, 2022. *Id.* ¶ 31. The Pledge of Allegiance began playing over the intercom while M.B. was walking in the hallway and, though some students stopped to acknowledge the Pledge of Allegiance, M.B. continued walking to her class. *Id.* ¶¶ 31, 33. While M.B. walked "silently in a non-disruptive manner," the Pledge of Allegiance concluded

and lapsed "into the indistinguishable call to remain standing for a Moment of Silence that immediately follows the Pledge of Allegiance." *Id.* ¶ 34. At some point in time while M.B. was walking to class, Livingston, an employee of Lexington One, singled M.B. out, "yelling and demanding" M.B. stop walking and "physically assault[ed]" M.B. by "pushing [her] on the wall and forcefully" touching her. *Id.* Livingston then escorted M.B. to Smith's office, where M.B. informed Smith she "was assaulted for walking and not stopping to acknowledge the Pledge of Allegiance." *Id.* ¶ 37. In response, Smith questioned M.B.'s love for her country. *Id.* Smith told M.B. he would review the security footage of the incident and sent her to her class. *Id.* ¶ 38. The Barnwells do not allege Smith, Livingston, or anyone associated with Lexington One took any further actions toward M.B. because of the incident.[1]

The Barnwells allege they "tried through numerous measures" to hold Livingston accountable for her actions toward M.B. *Id.* ¶ 40. Specifically, the Barnwells (including M.B.) attended a meeting of Lexington One's school board, where they made comments to the board concerning the November 29, 2022, incident involving M.B. and Livingston. *Id.* ¶ 41. The Barnwells also allege "upon information and belief" that the circumstances of the incident "were discussed up the chain of command with" Postlewait, Superintendent of Lexington One. *Id.* Though the Barnwells do not specifically identify the actions they wished Lexington One or Postlewait to take in response to their comments, they allege Lexington One and Postlewait continued to employ Livingston and Smith. *Id.* ¶¶ 45, 46.

---

[1] The Barnwells make brief reference to an incident that occurred when M.B. was an elementary school student and she refused to recite the Pledge of Allegiance with her classmates when prompted to do so. [*See* ECF No. 15 ¶ 29.] M.B.'s teacher allegedly questioned Fynale Barnwell about M.B.'s refusal, and Fynale informed the teacher she would not instruct M.B. to recite the Pledge of Allegiance. *Id.* ¶¶ 29–30. The Barnwells do not make any further allegations concerning this incident, nor do they address it in their opposition to either of the motions to dismiss.

The Barnwells sued SCDOE and the District Defendants a little over one month after the school board meeting. [*See* ECF No. 1.] The Barnwells later filed an amended complaint after SCDOE and the District Defendants moved to dismiss their original complaint. In the amended complaint, the Barnwells assert the following categories of claims: (1) common law claims of negligence/gross negligence and/or recklessness; negligent supervision, negligent hiring, negligent training, and negligent retention; and loss of personal services against Lexington One and SCDOE (first, second, and twelfth causes of action); (2) claims under 42 U.S.C. § 1983 seeking to hold Lexington One liable under various theories as set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978) (ninth, tenth, and eleventh causes of action); (3) claims under 42 U.S.C. § 1983 for violation of M.B.'s rights under the First, Fourth, and Fourteenth Amendments against Livingston (third, fourth, and sixth causes of action); (4) claims under 42 U.S.C. § 1983 for violation of M.B.'s rights under the First and Fourteenth Amendments against Livingston and Smith (fifth and seventh causes of action); and (5) a claim under 42 U.S.C. § 1983 seeking to hold Postlewait and Smith liable under a theory of supervisor liability (eight cause of action).

SCDOE and the District Defendants moved to dismiss the Barnwells' amended complaint in its entirety on various grounds. [*See* ECF Nos. 17 and 18.] The Barnwells opposed both motions. [*See* ECF Nos. 19 and 20.] Both sets of defendants submitted replies in further support of their motions. [*See* ECF Nos. 21 and 24.] With both motions fully briefed this matter is ripe for resolution by the court.

## LEGAL STANDARD

"A motion filed under Rule 12(b)(6) challenges the legal sufficiency of a complaint[.]" *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). To survive a Rule 12(b)(6) motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly* at 556.) "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

In reviewing the complaint, the court accepts all well-pleaded allegations as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc*., 417 F.3d 418, 420 (4th Cir. 2005); *Ashcroft*, 556 U.S. at 662 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."). But mere "[t]hreadbare recitals of the elements of a cause of actions, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678. Indeed, though the court must accept all factual allegations as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citing *Twombly* at 555 (internal quotation marks omitted).)

## DISCUSSION

SCDOE and the District Defendants both move to dismiss the Barnwells' amended complaint in its entirety for a myriad of reasons. SCDOE argues the Barnwells fail to allege any facts sufficient to state a claim against SCDOE as to any of their claims. The District Defendants argue they are immune from suit under the Eleventh Amendment. Alternatively, they argue each of the Barnwells' claims fail for discrete reasons. We address each of these arguments in turn.

## I.    SCDOE's Motion to Dismiss

SCDOE is not sure why it is involved in this litigation.  We aren't either.  The Barnwells assert three claims against SCDOE under the South Carolina Torts Claims Act—two based in negligence and one for loss of personal services—but they do not state a *single factual allegation* concerning SCDOE.  Instead, they broadly allege SCDOE is "empowered by law to make regulations to ensure that school districts operate legally, safely, and in a way that does not pose threats of constitutional injuries to students . . . ."  [ECF No. 15 ¶¶ 48, 55.]  They then conclude SCDOE failed to adopt any such policies or regulations to prevent students from suffering injuries to their First Amendment rights during the pledge of allegiance and moment of silence.  *Id.* However, the Barnwells' complaint lacks any factual context to support their conclusion. They do not identify which policies SCDOE has or has not passed.  They do not make any allegations as to SCDOE's hiring or supervisory practices.  Further, they do not identify a single SCDOE agent, servant, employee, or officer who took any offensive act or omission.  Indeed, the only individuals the Barnwells  assign liability toare Lexington One employees: Livingston, Smith, and Postlewait.  *See id.* ¶¶ 15–17 (alleging the individual defendants are Lexington One employees).  We thus dismiss the Barnwells' claims against SCDOE.

## II.    District Defendants' Motion to Dismiss

### A.    SCTCA Claims

The Barnwells assert three causes of action against Lexington One under the SCTCA: (1) negligence, gross negligence, and/or recklessness; (2) negligent supervision, negligent hiring, negligent training, and negligent retention; and (3) loss of personal services.   Lexington One argues each of these claims fail because they do not state a "loss" under the SCTCA.

The SCTCA grants immunity from liability and suit to the state of South Carolina, its political subdivisions (which include school districts), and employees while acting within the scope of their official duties, except as waived in the act. *See* S.C. Code Ann. §15-78-20(b); § 15-78-30(h). Still, a political subdivision is generally liable for its torts "in the same manner and to the same extent as a private individual under like circumstances," subject to limitations in the act. *Id.* § 15-78-40. "[A]ny person who may suffer a loss proximately caused by a tort of . . . a political subdivision . . . and its employee acting within the scope of his office" may file a claim under the SCTCA. *Id.* § 15-78-50. The statute defines "loss" as "bodily injury, disease, death, or damage to tangible property, including lost wages and economic loss to the person who suffered the injury, disease, or death, pain and suffering, mental anguish, and any other element of actual damages recoverable in actions for negligence, but does not include the intentional infliction of emotional harm." *Id.* § 15-78-30(f).

Lexington One and the Barnwells have differing readings of this definition. According to Lexington One's interpretation, the Barnwells must first plead "bodily injury, disease, death, or damage to property." [*See* ECF No. 18-1 at 11.] If the Barnwells establish any of these types of injuries, they may then claim actual damages, including pain and suffering and mental anguish. *Id.* The Barnwells counter that the text of the SCTCA plainly includes "mental anguish" in the definition of "loss." [*See* ECF No. 19 at 6.] The court agrees with the Barnwells. This provision lists the types of injuries that constitute "loss" under the SCTCA. That list includes "mental anguish." The court has found no case suggesting "mental anguish" is not a "loss" under the SCTCA. Nor has Lexington One pointed the court to any such cases.[2]

---

[2] The District Defendants do point to *Munday v. Beaufort County*, 9:20-cv-2144-DCN, 2023 WL 2643792, at *2 (D.S.C. Mar. 27, 2023). But the analysis in that case appears to focus on whether

What Lexington One *has* pointed the court to is case law suggesting mental anguish or emotional damage *alone* cannot support the damages element of negligence claims. On this point the court agrees. A plaintiff generally cannot recover damages for emotional distress if she has not suffered a physical injury, "unless there is some physical manifestation of the emotional distress." 18 S.C. Jur. Negligence § 24; *see also Dooley v. Richland Memorial Hospital*, 322 S.E.2d 669 (Ct. App. 1984) (reversing jury verdict where plaintiffs "failed to show any objective evidence of physical injury upon which to rest a claim for damages for emotional injury"). The Barnwells rely on our sister court's decision in *Woodberry v. United States*, No. 2:12-cv-1872-DCN, 2015 WL 4395154 (D.S.C. July 16, 2015) to argue that mental anguish is compensable. But that case simply stands for the proposition that mental anguish is an element of damages that a court can consider in determining a plaintiff's recovery. *Id.* at *6 (identifying mental anguish as one of several elements the court could consider in determining the plaintiff's damages). Indeed, the plaintiff in that case appeared to suffer physical injuries—bruises on her side and lower back and a tibial fracture. *Id.* at *1–*2. In any event, the *Woodberry* court noted mental anguish is only compensable "if it causes a substantial disruption in daily routine or a high degree of mental pain and distress." *Id.* at *14.

The Barnwells neither allege nor argue that M.B. suffered any sort of physical injury. [*See* ECF No. 15 ¶¶ 51 (alleging M.B. "sustained [severe] and permanent emotional distress, humiliation, mental anguish, indignity, loss of pleasures and enjoyment of life which required and will in the future require psychological and psychiatric medical care and treatment"), 58–59 (M.B.'s injuries required her to "expend monies, to receive additional medical attention, and to

---

"outrage torts" are barred under the SCTCA, not whether mental anguish alone is sufficient under the SCTCA.

require medical necessities" and caused her to suffer "physical pain, humiliation, mental anguish, emotional distress, medical expenses, wage loss, and loss of enjoyment of life"); ECF No. 19 at 6–7 (relying on allegations of mental anguish).]  And even these allegations do not fall within the type of mental anguish the *Woodberry* court deemed compensable: the Barnwells do not plead any facts suggesting M.B.'s alleged mental anguish caused any substantial disruption to her daily routine or a high degree of mental pain or distress.   For these reasons, we dismiss the Barnwells' negligence-based causes of action.

As to the Barnwells' loss of services claim, Lexington One cursorily suggests the court should dismiss that claim because it has not alleged facts sufficient to state a "loss" under the SCTCA.  [*See* ECF No. 18-1 at 2.]  Lexington One does not argue there are any other grounds to dismiss the Barnwells' loss of services claim.  As discussed above, the court does not agree with the District Defendants' conclusion that mental anguish alone is insufficient to state a claim under the SCTCA.  It thus declines to dismiss the Barnwells' loss of services claim on those grounds.  And, since Lexington One does not present any other argument as to why the Barnwells' claim fails, the court declines to dismiss the claim at this juncture.

## B.    § 1983 Claims

The Barnwells bring their remaining claims under 42 U.S.C. § 1983, which, while not a source of substantive rights itself, provides "a method for vindicating federal rights elsewhere conferred . . . ."  *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).  To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988).  Before addressing the substance of the

Barnwells' claims, however, we first consider the District Defendants' argument that they are immune from suit.

### 1.    Eleventh Amendment Immunity

The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  Put another way, the Eleventh Amendment "limits the jurisdiction of federal courts to hear cases against states and state officers acting in their official capacities."  *Child Evangelism Fellowship of South Carolina v. Anderson School Dist. 5*, 438 F. Supp. 2d 609, 617 (D.S.C. 2006), *reversed and remanded on other grounds*, *Child Evangelism Fellowship of South Carolina v. Anderson School Dist. 5*, 470 F.3d 1062 (4th Cir. 2006).  And while the Eleventh Amendment does not shield political subdivisions of a state (like counties or municipalities) it does extend to arms of the state.  *Id.* (citing *Mount Healthy City School Dist. Bd. of Educ. V. Doyle*, 429 U.S. 274, 280 (1977).)

The question here is whether Lexington One—a school district—is an arm of the state of South Carolina.  Several of our sister courts have grappled with this question, though no clear consensus has emerged.  *See Anderson v. Dorchester County*, No. 2:20-cv-20840DCN-MGB, 2021 WL 1186637, at *9 (D.S.C. Mar. 30, 2021) (noting the question is "far from clear cut" and concluding district defendants failed to carry their burden of establishing their entitlement to Eleventh Amendment immunity).  Eleventh Amendment immunity is thus a "case-specific inquiry that is dependent on the individual laws at issue."  *Child Evangelism*, 438 F. Supp. 2d at 618.

The Fourth Circuit has set the scope of our inquiry.  We first must consider the "twin reasons" for the Eleventh Amendment: (1) "the States' fears that 'federal courts would force them

to pay their Revolutionary War debts, leading to their financial ruin," and (2) "the integrity retained by each State in the federal system." *Cash v. Granville County Bd. of Educ.*, 242 F.3d 219, 223 (4th Cir. 2001)).  The first, most critical step is to determine whether the government entity would need to pay any judgment from the state's treasury. *Kitchen v. Upshaw*, 286 F.3d 179, 184 (4th Cir. 2002).  If so, our inquiry grinds to a halt: the entity is immune from suit. *Id.*  If not, we then determine if the relationship between the entity and the state is one where proceeding against the entity would "implicate the dignity of the State as a sovereign." *Id.*  The Fourth Circuit—and courts in this district, such as the *Child Evangelism* court—generally apply three factors in determining the impact on the State's sovereign dignity: "(a) the extent of control that the state exerts over the [entity] and the degree of autonomy that the entity enjoys from the state, (b) whether the entity deals with local rather than statewide concerns, and (c) the manner in which state law treats the entity." *Child Evangelism*, 438 F. Supp. 2d at 619 (citing *Cash*, 242 F.3d at 225–226; *Maryland Stadium Authority v. Ellerbe Becket Inc.*, 407 F.3d 255, 261 (4th Cir. 2005)).

The parties agree the State's treasury will not be impacted by this lawsuit.  We thus turn to the second step of the analysis: determining whether allowing the Barnwells' claim to proceed against the District Defendants will impact the State's sovereign dignity.  As explained below, we find that the District Defendants have not met demonstrated they are entitled to Eleventh Amendment immunity.

We first consider the extent of the State's control over Lexington One and its employees. The Fourth Circuit has delineated three factors to assist the court with its inquiry: "(1) whether the state retains a veto over the entity's actions; (2) the origins of the entity's funding; and (3) who appoints the entity's directors." *Id.* (citing *Ellerbe Becket*, 407 F.3d at n. 10 & 261(simplified).) Here, the District Defendants rely on our sister court's conclusion that a school district is an arm

10

of the state in *Smith v. School District of Greenville County*, 324 F. Supp. 2d 786 (D.S.C. 2004). In that case, the court, citing over ninety statutes and regulations the State imposed on public schools throughout South Carolina, concluded the State had "pervasive" control over school districts. *See Smith*, 324 F. Supp. 2d at 793 (internal citations, obviously, omitted).

the District Defendants also point to three acts the State passed in 2021 and 2022, arguing that they show an "expanding [S]tate control of public school systems: an act allowing the SCDOE the power to, in some scenarios, assume management of fiscally struggling school districts, an act allowing the governor to remove school district trustees under certain conditions, and an act allowing the governor, the state superintendent of education, or a majority membership of a county legislative delegation to initiate an investigation of a public school district. [*See* ECF No. 18-1 at 15.] But *Smith* was decided *before* the Fourth Circuit articulated the three subfactors, and the court did not consider any of those subfactors in reaching its decision. Though the *Smith* court's analysis is thorough, it does not control the court's decision here.

Given the Fourth Circuit's guidance, we find the *Child Evangelism* decision—the Barnwells' preferred case—instructive. In that case, the court noted the subject district was "an independent body which may sue and be sued, purchase liability insurance and retain private counsel, as it has in this case, without permission of the South Carolina Attorney General . . . [and] the [d]istrict board may purchase and hold real and personal property, build and repair buildings, and declare bankruptcy." *Child Evangelism*, 438 F. Supp. 2d at 619. So too, here. *See* S.C. Code § 59-17-10 (each district can sue and be sued, contract, and hold real and personal property). And while the District Defendants have pointed to acts indicating State actors can exert control over districts in *some* instances, they have not provided any argument concerning the subfactors the Fourth Circuit identified as guiding the court's analysis. The District Defendants thus have not

demonstrated the State's control over Lexington One and our analysis of the first factor weighs against applying Eleventh Amendment immunity.

Next, we consider whether Lexington One deals with local or statewide concerns. The parties are essentially in agreement here: the Barnwells argue Lexington One "plainly" deals with local concerns (students, teachers, and issues that are specific to the local communities the district services), and the District Defendants concede that even the *Smith* court concluded school districts primarily dealt with local concerns. We agree, and find this factor weighs against immunity.

Finally, we consider how state law treats Lexington One. The *Child Evangelism Fellowship* court pointed to "numerous factors . . . such as the ability of the District to contract, to own property, and to carry liability insurance, which weigh in favor of finding that the District is treated more like a local entity than an arm of the State." *Child Evangelism Fellowship*, 439 F. Supp. 2d at 620. The Barnwells also note the South Carolina Code addresses school districts and State departments in separate titles and that school districts have sued the state. [*See* ECF No. 19 at 10 (citing *Child Evangelism Fellowship*, 439 F. Supp. 2d at 620).] The District Defendants do not address either of these arguments in their reply. We again find the *Child Evangelism* decision instructive and agree that consideration of this factor weighs against finding Lexington One immune from suit.

In sum, Lexington One has not satisfied its burden of demonstrating it is immune from suit under the Eleventh Amendment, and we decline to grant them such immunity at this juncture. The same conclusion applies to Lexington One's employees Livingston, Smith, and Postlewait as well. Because we conclude the District Defendants are not immune from suit, we proceed with addressing each of the Barnwells' nine § 1983 claims.

### 2.    Violation of Fourteenth Amendment Due Process Rights

The Fourteenth Amendment guarantees its citizens that "[n]o State shall make or enforce any law which shall abridge [their] privileges or immunities . . . nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV. Relying on the Supreme Court's decision in *Ingraham v. Wright*, 430 U.S. 651 (1977), the Barnwells allege Livingston violated M.B.'s Fourteenth Amendment due process right to be free from "unjustified intrusions on personal security." *Id.* ¶ 64.  In *Ingraham*, which concerned corporal punishment in schools, the Supreme Court noted a minor's Fourteenth Amendment liberty interests are implicated "where school authorities, acting under color of state law, deliberately decide to punish a child for misconduct by restraining the child and inflicting appreciable physical pain." *Ingraham*, 430 U.S. at 675.  The Supreme Court did *not*, however, decide "under what circumstances corporal punishment of a public-school child may give rise to an independent federal cause of action to vindicate substantive rights under the Due Process Clause." *Id.* at 679 n. 47.

The Fourth Circuit later held the "substantive due process inquiry in school corporal punishment cases must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980); *see also Meeker v. Edmundson*, 415 F.3d 317, 321 (4th Cir. 2005) (noting the *Hall* court articulated the proper "substantive due process inquiry," which "focuses on the force imposed by school authorities).  Other courts in this circuit have noted "[t]he threshold for establishing a constitutional tort for excessive corporal punishment is a high one," and that a plaintiff "must allege more than

13

the commission of an ordinary common-law tort." *Brown ex rel. Brown v. Ramsey*, 121 F. Supp. 2d 911, 922 (E.D. Va. 2000), *aff'd sub nom., Brown v. Ramsey*, 10 F. App'x 131 (4th Cir. 2001). With this framework in mind, we turn to the Barnwells' Fourteenth Amendment claim.

The Barnwells here allege Livingston "assaulted" M.B. and "imposed herself in such a way that [M.B.] felt intimidated, coerced, and without a choice but to comply with her demands or risk severe punishment. [ECF No. 15 ¶ 64.] As discussed above, Livingston allegedly pushed M.B. "on the wall" and "forcefully" touched M.B. *Id.* ¶ 34. Livingston's alleged "use of force was disproportionate to the need presented . . . excessive, unwarranted, did cause severe injury to [M.B.], and was an unwise excess of zeal motivated by discriminatory animus and outrage . . . certainly shocking the conscious of any reasonable person . . . ." *Id.* ¶ 66. The District Defendants argue the Barnwells' claim fails because they do not allege facts demonstrating M.B. was severely injured or that Livingston's actions amounted to a brutal and inhumane abuse of power that literally shocks the court's conscience. [*See* ECF No. 18-1 at 19–20; ECF No. 24 at 4–5.] We agree.

The Barnwells conclude M.B. was "severely injured" by Livingston's purported assault, but they do not allege any facts that plausibly suggest M.B. was "severely injured." [*See* ECF No. 15 ¶ 66.] Instead, the Barnwells allege only that Livingston "push[ed] M.B., (sic) on the wall" and "forcefully touch[ed] M.B. in an unwanted way." *Id.* ¶ 34. These allegations, without more, do not allow the court to infer that Livington's alleged use of force caused M.B. severe injury. At most, the Barnwells' allegations (made in support of a different cause of action) allow the court to conclude she suffered physical pain from Livingston's use of force. *See id.* ¶ 46 (alleging M.B. suffered physical pain because of Livingston's actions). While the court certainly does not trivialize any pain M.B. felt, these allegations stand in stark contrast to the kinds of allegations the Fourth Circuit has found plausibly state a claim for substantive due process violations. *See, e.g.*,

*Hall*, 621 F.2d at 614 (minor plaintiff plausibly stated a claim for relief where the plaintiff alleged that defendant "without apparent provocation" struck minor with a homemade paddle and engaged in a struggle with the minor where defendant "violently shoved" the minor against a stationary desk and continued to "repeatedly and violently" strike the minor with a rubber paddle, causing the minor to be admitted to a hospital for 10 days for treatment of traumatic injuries); *Meeker*, 415 F.3d at 319 (minor plaintiff adequately alleged requisite injury for a substantive due process claim where minor alleged defendant coach "repeatedly directed . . . unprovoked and malicious beatings" that caused minor to suffer excruciating physical pain, inflammation of the body, and potentially permanent traumatic stress disorders).

The Barnwells' characterization of Livingston's actions as "arbitrary" does not save their claim either.  [*See* ECF No. 19 at 13 (arguing Livingston's actions amounted to "arbitrary" punishment).]  Like the slap in *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716 (6th Cir. 1996), the push and "forceful, unwanted touching" here fails to shock the conscience.  In *Lillard,* three minor students and their parents sued a coach at their school, the county board of education, the school principal, and the superintendent of the county schools.  *Id.* at 718.  One of the students alleged the coach detained her after class, verbally abused her, and then slapped her across the face while holding her chin with one hand.  *Id.* at 4.  The plaintiff brought a claim for violation of her substantive due process rights because of the coach's conduct.  *Id.* at 8.  The district court dismissed this claim, finding the plaintiff's allegation that the coach slapped her face did not rise to the level of conduct that "shocks the conscience."  *Id.*  While acknowledging the record in that case did not reflect any legitimate disciplinary purpose for the slap, the Sixth Circuit affirmed the district court's decision, finding "it is simply inconceivable that a single slap could shock the conscience."  *Id*. at 725–726.  And while the Sixth Circuit described the coach's actions as "careless and unwise,"

15

it noted those actions "fell far short of 'brutal,' or 'inhumane,' or any of the other adjectives employed to describe an act so vicious as to constitute a violation of substantive due process." *Id.*

Here, too, Livingston's alleged actions, even taken as true, do not rise to the level of a constitutional violation. The Barnwells do not allege facts that allow this court to infer Livingston's actions were so malicious or sadistic that they amounted to an inhumane abuse of power "rather than a merely careless or unwise excess of zeal." *See Hall*, 621 F.2d at 613. On the contrary, the Barnwells themselves describe Livingston's actions as "an unwise excess of zeal." [ECF No. 15 ¶ 66.] While Livingston's alleged actions may have been unwise, the court cannot conclude that they "shock[] the conscience of any reasonable person," as the Barnwells allege. *Id.* So, we dismiss the Barnwells' substantive due process claim.

### 3.    Violation of Fourth Amendment Rights

The Fourth Amendment secures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . .." U.S. Const. amend. IV. Though the Fourth Amendment is most frequently implicated in criminal actions, the Supreme Court extended the Fourth Amendment to school searches in *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985). Though *T.L.O.* only concerned a search, the Fourth Circuit has expanded its reach to seizures of students by school officials as well. *See Wofford v. Evans*, 390 F.3d 318, 325–326 (4th Cir. 2004).

The Barnwells here allege Livingston violated M.B.'s Fourth Amendment rights against unreasonable seizure and excessive force by assaulting M.B., imposing herself on M.B. and using excessive force "in such a way that [M.B.] felt intimidated, coerced, chilled, and deterred from exercising" her right to refrain from acknowledging the Pledge of Allegiance. [ECF No. 15 ¶ 71.]The District Defendants do not agree. Instead, theypoint the court to the Ninth Circuit's

decision in *U.S. v. Attson*, 900 F.2d 1427 (9th Cir. 2000), which held non-law enforcement conduct is only considered a "seizure" that falls within the scope of the Fourth Amendment if the conduct is "motivated by some sort of investigatory or administrative purpose designed to elicit a benefit for the government." *Id.* at 1430. Relying on *Attson*, the District Defendants argue Livingston's "seizure" of M.B. did not result in M.B. receiving any punishment and otherwise did not serve any District purpose and thus was "clearly not for the benefit of the government in an investigative or administrative capacity." [ECF No. 18-1 at 20–21.] In their reply, the District Defendants also argue Livingston's alleged seizure was no more than a *de minimis* imposition on M.B.'s freedom of movement and thus cannot sustain a cause of action. [ECF No. 24 at 5–6.]

The court is not convinced the Fourth Circuit places a similar limitation on the definition of seizure in a school context. To the contrary, in *DesRoches by DesRoches v. Caprio*, 156 F.3d 571, 574 (4th Cir. 1998) the court made clear that "[s]earches and seizures carried out by school officials are governed by the same Fourth Amendment principles that apply in other contexts." And other courts have called the Ninth Circuit's rationale in *Attson* into question. *See, e.g.*, *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1207 (10th Cir. 2003) (". . . the defendants' contention that the Fourth Amendment does not apply in the 'noncriminal' and 'noninvestigatory' context is without foundation. The focus of the [Fourth] Amendment is [] on the security of the person, not the identity of the searcher or the purpose of the search."); *Vardeman v. City of Houston*, 55 F.4th 1045, n.1 (5th Cir. 2022) (recognizing *Attson*'s rationale impliedly overruled by *Soldal v. Cook Cnty.*, 506 U.S. 56 (1992)); *Jone Doe I v. Valencia College Board of Trustees*, 838 F.3d 1207, 1212–1213 (11th Cir. 2016) (noting *Attson* "is not good law" in light of *Soldal*). Because *Attson*'s rationale is doubtful and, in any event, the Fourth Circuit has not articulated a similar rationale, the court declines to dismiss the Barnwells' claims on this ground.

Further, the court cannot conclude at this time that any imposition on M.B.'s freedom of movement was *de minimis*. The District Defendants argue we "must" infer from the Barnwells' allegations that Livingston's detention of M.B. was brief. [ECF No. 24 at 6.] But on a motion to dismiss under Rule 12(b)(6), we must construe all facts and reasonable inferences derived from those facts in favor of the Barnwells. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). There is no allegation as to the length of the detention in the Barnwells' amended complaint. While discovery may well reveal that Livingston's alleged seizure of M.B. was, in fact, *de minimis*, the court cannot arrive at such a conclusion *now*. We thus deny the District Defendants' request to dismiss the Barnwells' fourth cause of action.

### 4.    Violation of Fourteenth Amendment Equal Protection Rights

The Barnwells also assert a claim against Livingston and Smith for violation of M.B.'s Fourteenth Amendment rights to equal protection of the laws. [*See* ECF No. 15 ¶¶ 74–80.] The Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The District Defendants argue the Barnwells' claim fails because the Barnwells do not allege M.B. was forced to violate any sincerely held beliefs or punished for continuing to walk during the Pledge of Allegiance. [ECF No. 18-1 at 21–22.] They also argue the Barnwells do not make any "factually supported" allegation M.B. was treated differently from others for exercising her beliefs concerning the Pledge of Allegiance or that any treatment resulted from a discriminatory animus. *Id.* We disagree in part.

The Fourth Circuit has held a plaintiff "must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus" to survive a motion to dismiss an equal protection claim. *Sheppard v. Visitors of Virginia State University*, 993 F.3d 230, 238 (4th Cir.

18

2021) (citing *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011))[3]. The Barnwells here allege "there were people of other races walking in the hallway" when Livingston "singled out" M.B. [ECF No. 15 ¶ 35.] They also allege Livingston was motivated by a "discriminatory animus and bias" in subjecting M.B., "the only African American in her view" to unequal treatment. *Id.*; *see also id.* ¶ 77 (alleging Livingston singled out M.B. and discriminated against her due in part to "her minority status as an African American woman"). As to Livingston, at least, the Barnwells have plausibly stated an equal protection claim.

We cannot say the same for the Barnwells' claim against Smith. As to Smith, the Barnwells allege only that he "was made aware of" Livingston's conduct toward M.B. and that he did not take any steps to remedy the "violation" or "prevent future violations from occurring." *Id.* ¶¶ 78–79. The Barnwells do not point to any allegation suggesting Smith treated M.B. differently from any other similarly student or that Smith's treatment of M.B. was motivated by a discriminatory animus. Absent these allegations, the Barnwells' equal protection claim against Smith fails. So, while we decline to dismiss the Barnwells' fifth cause of action against Livingston, we grant the District Defendants' request to dismiss the claim as to Smith.

### 5.    Violation of First Amendment Free Speech Rights

The First Amendment prohibits the government from making any law "abridging the freedom of speech." U.S. Const. amend. I. As to this claim, the Barnwells allege Livingston singled out and discriminated against M.B. because of the latter's sincerely held beliefs "exhibited by her choice to refuse to stop walking to acknowledge the Pledge of Allegiance and continuing to walk into the indistinguishable call to remain standing for a Moment of Silence." [ECF No. 15

---

[3] The District Defendants characterize *Sheppard* as requiring a plaintiff to plead facts to plausibly allege a student was *punished*. The *Sheppard* decision makes no mention of any "punishment" requirement.

¶ 86.]  They also allege Livingston "demanded that M.B. stop to acknowledge the Pledge of Allegiance . . .."  *Id.* ¶ 5.  The District Defendants argue these allegations do not state a claim for violation of M.B.'s first amendment rights because the Barnwells do not point to any resolution, regulation, law, or policy compelling M.B. to salute or pledge allegiance to the flag, and, in any event, any interruption to her "silent 'protest'" was *de minimis* and thus not actionable.  [*See* ECF No. 18-1 at 22–23; ECF No. 24 at 7–8.]  The court disagrees.

The Barnwells' claim appears to arise out of the Supreme Court's decision in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943).  In that case, the board of education adopted a resolution requiring all public-school teachers and students to salute the American flag and repeat a pledge of allegiance to the flag.  *Id.* at 627–628.  The resolution also deemed any refusal to salute the flag an "[a]ct of insubordination" that would be "dealt with by expulsion."  *Id.* The resolution prohibited any insubordinate student from being readmitted to the school until the student complied with the resolution.  *Id.* at 629.  The expelled student was considered "unlawfully absent" from school and thus a "delinquent," exposing his parents or guardians to potential prosecution.  *Id.*  The resolution presented significant problems among the Jehovah's Witness community of West Virginia, which refused to salute the flag: students were threatened with expulsion or expelled, officials threatened to send them to juvenile reform facilities, and the students' parents were threatened with prosecution or prosecuted for causing delinquency.  *Id.* at 630.  Walter Barnette, the father of two students who refused to salute the flag, and others sued the board, seeking an injunction to prevent the board from enforcing the regulations against Jehovah's Witnesses.   The district court found for Barnette, and the board appealed.

The Supreme Court also ruled in favor of Barnette, noting the "fixed star in our constitutional constellation" that "no official . . . can prescribe what shall be orthodox in politics,

20

nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.* at 641. The board's actions "in compelling the flag salute and pledge" thus "transcend[ed] constitutional limitations on their power and invade[d] the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.* Put another way, *Barnette* "clearly and specifically established that schoolchildren have the right to refuse to say the Pledge of Allegiance." *Holloman ex rel. Holloman v. Harland*, 370 F.3 1252, 1269 (11th Cir. 2004).

To the District Defendants' point, the Barnwells do not allege Livingston or anyone else associated with the District Defendants forced M.B. to salute the flag or stop to recite the Pledge of Allegiance. [*See* ECF No. 18-1 at 6.] The Barwells *do,* however, allege that Livingston demanded M.B. stop walking and acknowledge the pledge of allegiance. [ECF No. 15 ¶ 5.] They allege Livingston *did* punish M.B. for refusing to "acknowledge" the Pledge of Allegiance—by "dragging her to the principal's office." [*See* ECF No. 19 at 15.] At this juncture, and construing all reasonable inferences in the Barnwells' favor, the court cannot conclude that the Barnwells fail to plausibly state a claim for relief.

Additionally, for the reasons discussed above in connection with the Barnwells' seizure and excessive force claim, the court simply cannot conclude M.B. only suffered a *de minimis* imposition on her First Amendment rights. Here, too, discovery may very well reveal that M.B did not suffer any deprivation of her First Amendment rights. But that is a fight for another day. The court denies the District Defendants' motion to dismiss this claim.

### 6. Retaliation

The First Amendment right to free speech includes both the right to speak *and* "the right to be free from retaliation by a public official for the exercise of that right." *Snoeyenbos v. Curtis*,

60 F.4th 723, 729 (4th Cir. 2023) (citing *Constantine v. Rectors & Visitors of George Madison University*, 411 F.3d 474, 499 (4th Cir. 2005). To plausibly state a claim for First Amendment retaliation, a plaintiff must allege that "(1) she engaged in protected First Amendment Activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct." *Id.* at 730 (quotation marks omitted). As the Barnwells point out, a retaliation claim "must establish that the government responded to the plaintiff's constitutionally protected activity with conduct or speech that would chill or adversely affect his protected activity." *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006).

The Barnwells lodge their retaliation claim against both Livingston and Smith. First, Livingston: The Barnwells allege Livingston singled out M.B. because of M.B.'s refusal to stop walking and acknowledge the Pledge of Allegiance. [ECF No. 15 ¶ 95.] When M.B. did not acknowledge the Pledge of Allegiance or stop to recite the Pledge of Allegiance, they allege Livingston took her to Smith's office to be punished or reprimanded because of those actions. *Id.* ¶ 97. As to Smith, the Barnwells allege Smith questioned M.B.'s love of her country and patriotism "in response" to M.B.'s assertions that Livingston "assaulted" M.B. because M.B. continued walking and did not stop to acknowledge the pledge of allegiance. *Id.* ¶¶ 100–101. As a result of Livingston and Smith's actions, M.B. "suffer[ed] an injury that would chill a person of ordinary firmness from continuing to engage in the same constitutionally protected speech that [M.B.] demonstrated." *Id.* ¶¶ 98, 102.

The District Defendants argue the Barnwells have not established that Livingston or Smith took any action that adversely affected M.B.'s first amendment rights. [ECF No. 18-1 at 23.] Specifically, they note the Barnwells do not allege anyone forced M.B. to recite the pledge of

allegiance, salute the flag, or stand in silence "in regard for" the flag. *Id.* at 24. And to the extent Livingston's decision to stop M.B. in the hall constitutes punishment, they argue, such a stop is a *de minimis* inconvenience. *Id.* Likewise, Smith's alleged comments concerning M.B.'s patriotism were "mere words and of no inconvenience at all." *Id.* We cannot agree at this juncture.

Though the Barnwells' allegations are largely conclusory, they nonetheless allege Livingston and Smith took actions that adversely affected M.B.'s First Amendment rights: Livingston "dragged" M.B. to Smith's office and Smith questioned M.B.'s patriotism. While the court certainly makes no assessment as to the strength of these allegations, the motion before the court today is a motion to dismiss under Rule 12(b)(6). Under that standard, and construing all inferences in the Barnwells' favor, we conclude the Barnwells have stated a claim for first Amendment Retaliation. We thus deny the District Defendants' motion to dismiss this claim.

### 7.    Supervisor Liability

That supervisory officials "may be held liable in certain circumstances for constitutional injuries inflicted by their subordinates" is a "firmly entrenched" principle. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). This liability is "not premised upon *respondeat superior* but upon 'a recognition that supervisor indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries on those committed to their care." *Id.* (quoting *Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984).) Liability "ultimately is determined by pinpointing the persons in the decision-making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." *Id.* (internal quotation omitted.)

Under *Shaw*, the Fourth Circuit articulated three elements a plaintiff must show to establish supervisory liability: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of

23

constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by plaintiff." *Id.* at 799 (internal quotations omitted).

Under the first element, the "pervasive" and "unreasonable" risk of harm prong requires "evidence the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* Under the second element requiring a showing of deliberate indifference, a plaintiff must show "a supervisor's continued inaction in the face of documented widespread abuses." And finally, with the third element, the plaintiff must establish a causal link between the supervisor's inaction and the harm suffered by the plaintiff. *Id.*

In addition to Livingston, the Barnwells seek to hold Smith and Postlewait liable under theories of supervisor liability. Specifically, they allege Smith had actual knowledge of Livingston's actions and, even with that knowledge, did not attempt to correct or reprimand her or otherwise "intervene with her conduct." [ECF No. 19 at 18; *see also* ECF No. 15 ¶¶ 102, 110.] As to Postlewait, they allege "[u]pon information and belief" that "the facts and circumstances surrounding the violation of M.B.'s constitutional rights were discussed up the chain of command with . . . Postlewait." [ECF No. 15 ¶ 41.] They also allege, again, "upon information and belief," that Smith and Postlewait had actual or constructive knowledge of Livingston's conduct and that Livingston "posed harm to students at River Bluff High School, including [M.B.]". *Id.* ¶ 109. The District Defendants argue these allegations do not plausibly state a claim for supervisory liability under § 1983. We agree.

24

Even accepting the allegations of the complaint as true and viewing them in the light most favorable to the Barnwells, the court cannot conclude the Barnwells have stated a plausible claim for supervisory liability against Smith and Postlewait.  The Barnwells' complaint is entirely bereft of *any* allegation suggesting Livingston's alleged behavior was widespread or that Smith or Postelwait  failed to act in the face of documented, widespread abuses.  Instead, they allege Smith and Postlewait became aware of Livingston's conduct after M.B. was escorted to Smith's office. [*See* ECF No. 19 at 18–19 (Smith was made aware of Livingston's actions by M.B. "*immediately after* the conduct occurred" (emphasis added)); *see also* ECF No. 15 ¶¶ 100–101.]. The crux of the Barnwells' claim against Smith and Postlewait, then, is that these supervisory officials failed to take any sort of corrective action *after* learning about Livingston's conduct toward M.B.  [*See* ECF No. 15 ¶ 110 (alleging Smith and Postlewait "despite actual and/or constructive knowledge that Nicole Livingston violated [M.B.'s] constitutional rights . . . fail[ed] to act, intervene, correct, discipline, or prevent Nicole Livingston from continuing such action.")  But as the District Defendants point out, "the failure to take remedial action *after* an alleged constitutional violation does not cause or contribute to such violation or otherwise provide a basis for liability under § 1983." *Wall v. Clarke*, No. 7:19-cv-00260, 2021 WL 5444754, at *7 (W.D. Va. Nov. 22, 2021). Here, the Barnwells seek to hold Smith and Postlewait liable under a supervisory liability theory for their failure to act *after* M.B.'s alleged constitutional violations occurred.  They do not plead any factual allegations indicating Smith and Postlewait's failure to act *caused* the violations.  For this reason, we dismiss their eighth cause of action.

### 8.    *Monell* Liability

As discussed above, § 1983 makes every *person* who violates another's federal rights while acting under cover of state law liable to the party injured for those actions.  Municipalities are also

amenable to suit, as the Supreme Court held they qualify as "persons" under § 1983. *See Monell v. New York City Department of Social Services*, 436 U.S. 658, 690 (1973). But this liability does not derive from *respondeat superior* principles—a municipality is not liable "for all constitutional violations of their employees simply because of the employment relationship." *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987) (citing *Monell*, 436 U.S. at 692–694). Instead, a municipality is only liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or act may fairly be said to represent official policy, inflicts the injury." *Id.* (citing *Monell* at 694.) Critically, though, "proof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom." *Semple v. City of Moundsville*, 195 F.3d 708, 713–714 (4th Cir. 1999) (citing *Spell*, 824 F.2d at 1387–1388.) Stated differently: a single incident does not a policy make.

A "policy" or "custom" can arise in four ways: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (internal citations omitted). Only three of these theories of liability are implicated here: the School Board's final policymaking decision to ratify Smith and Livingston's actions, Lexington One's alleged failure to properly train its employees, and Lexington One's practice concerning the Pledge of Allegiance. The District Defendants discuss the Barnwells' failure to train theory and their policies and customs theory separately from their ratification theory. We thus address the Barnwells' claims in that manner as well.

First, the Barnwells' failure to train theory. Under that theory, a municipality is liable for failing to properly train its employees if the failure to train "amount[s] to deliberate indifference to the rights of persons with whom the [employees] come into contact." *Estate of Jones by Jones v. City of Martinsburg, West Virginia*, 961 F.3d 661, 671 (4th Cir. 2020). A municipality's failure to train is considered the "moving force [behind] the constitutional violation" if that failure "reflects such a deliberate or consciously indifferent 'policy.'" *Id.* (internal citations omitted). The training deficiency 'must be closely related to the ultimate injury, meaning it must cause the incident." Generally, "a single incident is almost never enough to warrant municipal liability." *Id.* The Supreme Court has, however, provided an exception to that general principle, where "'in light of the duties assigned to specific officers or employees the need for more or different training [is] so obvious, and the inadequacy so likely to result in a violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need[.]'" *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).) Even with this exception, "the strict *Monell* test asks for some level of notice." *Id.*

The District Defendants argue the Barnwells have failed to state a claim under this theory because the Barnwells' amended complaint points to only a single, isolated incident: the November 2022 incident between Livingston and M.B. [*See* ECF No. 18 at 26–27.] The Barnwells do not deny that they point only to a single isolated incident. They argue they have, nonetheless, alleged sufficient facts to plausibly state a claim against Lexington One. As to Lexington One's alleged failure to train its employees, the Barnwells allege Lexington One "failed to train, supervise, and discipline their employees on issues/violations of students' constitutional rights concerning the Pledge of Allegiance" despite "an obvious need to train . . . employees on protecting students' constitutional rights concerning the Pledge of Allegiance." *Id.* ¶ 3. The Barnwells also allege

27

Lexington One's "failure to train, supervise, or discipline" its employees despite their "obvious need to train their employees . . . on students' [constitutional] rights" demonstrates Lexington One's "objective[] and deliberate[] indifference" to its students' constitutional rights. *Id.* ¶ 115; *see also id.* ¶ 116.

These allegations are insufficient to sustain the Barnwells' failure to train theory. At bottom, the Barnwells' claims arise out of a single incident: Livingston's November 29, 2022, interaction with M.B. The Barnwells do not allege any facts beyond this single incident to support their failure to train theory. Instead, they simply allege there was an "obvious" need for Lexington One to train its employees as to students' constitutional rights with respect to the Pledge of Allegiance. [*See* ECF No. 19 at 21.] While the Barnwells are correct that the Supreme Court *has* alluded to an exception to the "*Canton* exception" in a "narrow range of circumstances," they do not plead *any* facts that would allow the court to infer that there was an "obvious" need for Lexington One to provide this training. Merely stating that facts exist, or that something is obvious, does not make it so and is insufficient to satisfy Rule 12(b)(6). *See Ashcroft*, 556 U.S. at 678 ("[t]hreadbare recitals of the elements of a cause of actions, supported by mere conclusory statements, do not suffice.")

Turning to the Barnwells' so-called "customs and practices" theory, an unconstitutional custom or practice "may arise if a practice is so persistent and widespread and so permanent and well-settled as to constitute a custom or usage with the force of law." *Lytle*, 326 F.3d at 463 (citing *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (internal quotation marks omitted). Isolated incidents of unconstitutional conduct by employees cannot establish a custom or practice for purposes of liability under § 1983. *Id.*; *see also Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 402–403 (4th Cir. 2014) ("Sporadic or isolated violations of rights will not give rise

to *Monell* liability; only 'widespread or flagrant' violations will.").  Instead, "there must be 'numerous particular instances' of unconstitutional conduct in order to establish a custom or practice." *Id.* (citing *Kopf v. Wing*, 942 F.2d 265, 269 (4th Cir. 1991)).  Specifically, "[a] plaintiff must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Id.* (citing *Spell*, 824 F.2d at 1386–1391.)

With respect to this theory, the Barnwells take issue with Lexington One's "custom and practice," of "instruct[ing] students to rise and stand for the Pledge of Allegiance and immediately following the last words of the Pledge of Allegiance to remain standing for the Moment of Silence." *Id.* ¶ 123.  They allege the instruction makes the transition from the Pledge of Allegiance to the Moment of Silence "indistinguishable for students thereby having the force of law for which making (*sic*) Lexington School District One responsible under Section 1983." *Id.*  This "force of law" allows Lexington One's "employees to retaliate against students who decide to exercise their First Amendment Rights during the Pledge of Allegiance and indistinguishable Moment of Silence . . .." *Id.*; *see also id.* ¶ 4.

We agree with the District Defendants: these allegations do not plausibly state a *Monell* claim.  Even stretching our analysis under Rule 12(b)(6) to its outermost reaches, the Barnwells have alleged Lexington One has a "custom and practice" of instructing its students to rise for the Pledge of Allegiance and remain standing for a Moment of Silence.  [ECF No. 15 ¶ 123.]  They also allege this "custom" has the "force of law" because the lapse from the Pledge of Allegiance to the Moment of Silence is "indistinguishable." *Id.*  But these allegations, like the allegation that an "obvious" need for training exits, amount to nothing more than conclusions.  The Barnwells do

not plead any facts suggesting Lexington One's alleged policy is sufficiently persistent and widespread to give it the force of law. They never even allege the policy *is* widespread. And they certainly do not plead any facts suggesting how the policy allows its employees to retaliate against students.

At most, the Barnwells point to two incidents occurring several years apart that could conceivably support their claim. In the earlier incident, which occurred when M.B. was a student at an elementary school in Lexington One, a teacher called Fynale Barnwell to inform her that M.B. did not recite the Pledge of Allegiance with her classmates when instructed to do so over the intercom. [*Id.* ¶ 29.] The Barnwells make no mention of any further action resulting from this incident. The second incident is the subject incident between M.B. and Livingston, which occurred when M.B. was a high school student. Even construing any reasonable inferences from these occasions in the Barnwells' favor, the court cannot conclude allegations concerning these events are sufficient to infer any sort of "persistent and widespread" practice on Lexington One's part. They are instead the kind of "[s]poradic and isolated" events that the Fourth Circuit has held "will not give rise to *Monell* liability." *Owens*, 767 F.3d at 403.

Finally, ratification. As discussed above, "an affirmative decision by a final policymaker can serve as a 'policy' under *Monell*." *Starbuck v. Williamsburg James City County School Board*, 28 F.4th 529, 534 (4th Cir. 2022). If "a final policymaker has the authority to review the decision of a subordinate, its approval of that allegedly unconstitutional decision can give rise to liability under Section 1983." *Id.* However, the Barnwells' assert their final theory of municipal liability against Lexington One, even though it arises out of actions the Lexington One *School Board* allegedly took. [*See* ECF No. 15 ¶¶ 126–134.] Specifically, the Barnwells allege *the School Board* received final policy-making authority from Lexington One concerning Livingston and Smith's

alleged actions and *the School Board* deliberately chose to approve those actions. *Id.* ¶¶ 133–134. This is a problem, as the Barnwells have sued the District, *not* the School Board.   The Barnwells *do* allege in the immediately preceding paragraph that the District was aware of Smith and Livingston's alleged actions "and [was] the final policymaker." *Id.* ¶ 132.  However, the Barnwells do not allege the District ratified any allegedly unconstitutional conduct in support of this claim. In their opposition, they do not provide any insight into how the court can infer the *District* made any sort of affirmative decision when they allege the *School Board* is the body with final policymaking authority that ratified Livingston and Smith's actions.   Therefore, the Barnwells' ratification theory fails.

Having found the Barnwells fail to state a claim for *Monell* liability under any of the foregoing theories, we dismiss their ninth, tenth, and eleventh causes of action.

### C.     Summary

Given the number of claims and parties, the court concludes the matter with a summary of its decision to assist the parties in moving forward.   First, we dismiss all claims against SCDOE. Next, we decline to grant the District Defendants Eleventh Amendment immunity at this stage in the proceedings.   Addressing the Barnwells' claims against the District Defendants individually, we dismiss the Barnwells' first, second, third, eighth, ninth, tenth, and eleventh causes of actions in their entirety.   We also dismiss the Barnwells' fifth cause of action as to Smith.   That leaves the following claims: the Barnwells' fourth, fifth (as to Livingston only), sixth, seventh, and twelfth causes of action.   The court's dismissal of these claims is without prejudice.

## CONCLUSION

For the reasons above, the court **GRANTS** SCDOE's motion to dismiss, ECF No. 17, in its entirety, and **GRANTS** in part and **DENIES** in part the District Defendants' motion to dismiss, ECF No. 18, as set forth above.

**IT IS SO ORDERED.**

February 20, 2024                                    Sherri A. Lydon
Columbia, South Carolina                             United States District Judge